## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| C & K TRUCKING, LLC, | |
|       Plaintiff and Counterclaim Defendant, | |
| v. | Civil Action No. 3:20-CV-01104-K |
| ARDENT MILLS, LLC, | |
|       Defendant and Counterclaim Plaintiff. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Defendant and Counterclaim Plaintiff Ardent Mills, LLC's Motion for Summary Judgment ("Defendant's Motion") (Doc. No. 52), Plaintiff's Response to Defendant's Motion for Summary Judgment ("Plaintiff's Response") (Doc. No. 56), and Reply Brief in Support of Defendant and Counterclaim Plaintiff Ardent Mills, LLC's Motion for Summary Judgment ("Defendant's Reply") (Doc. No. 62). After carefully considering Defendant's Motion, Plaintiff's Response, Defendant's Reply, the associated briefs and appendices, and the relevant law, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion.

Also before the Court are Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim ("Plaintiff's Motion") (Doc. No. 49), Defendant and Counterclaim Plaintiff Ardent Mills, LLC's Response in Opposition to Plaintiff and Counterclaim Defendant's Motion for Summary Judgment ("Defendant's Response")

1

(Doc. No. 54), and Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim ("Plaintiff's Reply") (Doc. No. 61). Because the Court grants summary judgment as to Plaintiff's liability on Defendant's breach of contract counterclaim, Plaintiff's Motion is **DENIED**.

## I.     Brief Factual and Procedural Background

### A.  The Parties

C & K Trucking, LLC ("Plaintiff" or "CKT") is a trucking business owned and operated by Kenyon Collins ("Collins"). *See* Doc. No. 31 ¶ 7. Relevantly, Collins is African American, and the majority of CKT's drivers are minorities. *Id.* ¶¶ 7, 9. Ardent Mills, LLC ("Defendant" or "Ardent Mills") is a flour-milling and ingredient business. *See* Doc. No. 53 at 6. After milling wheat into flour, Ardent Mills sells that flour along with certain byproducts of the milling process. *See id.* Ardent Mills' Saginaw, Texas and Sherman, Texas facilities sometimes contract with third-party motor carriers to transport raw materials, finished products, and certain byproducts to and from those plants. *See id.* CKT was one of those motor carriers. *See* Doc. No. 31 ¶ 10.

### B.  The Motor Transportation Agreement

CKT's relationship with Ardent Mills goes back to at least the summer of 2010, when CKT began hauling out of Ardent Mills' Saginaw plant. *Id.* On or about February 18, 2015, CKT entered into a Motor Transportation Agreement (the "MTA") with Ardent Mills whereby CKT agreed to provide motor transportation services to Ardent Mills pursuant to the terms of the Agreement (it is unclear why the parties had not

signed such an agreement prior to this date). *See* Doc. No. 53-1 at 203. The MTA purports to govern the relationship between the parties; it defines CKT as an independent contractor and covers—among other things—compensation rates and carrier insurance and maintenance requirements. *See id.* at 196-200. The MTA is non-exclusive—under its terms, CKT is free to accept fright from companies other than Ardent Mills, and Ardent Mills is free to tender freight to companies other than CKT. *See id.* at 201. The MTA may be terminated immediately upon the occurrence of a specified event or by either party upon sixty days' prior written notice ("Sixty Days' Notice Clause"). *See id.* at 200.

### C. Disparate Treatment Allegations

CKT continued to haul for Ardent Mills' Saginaw plant for the next several years. Doc. No. 31 ¶ 13. It was during this time that CKT alleges it "began noticing that its drivers were being treated differently than other non-minority truckers driving for Ardent Mills." *Id.* For example, CKT alleges its drivers were required "to wait and unload shipments in the back of the Ardent Mills [Saginaw] facility, while non-minority truckers unloaded in the front." *Id.* ¶ 14. CKT also alleges, *inter alia*, that it was reprimanded disproportionately for violating Ardent Mills' tarping requirements. *Id.*

### D. Physical Confrontation at the Saginaw Facility

On November 22, 2016, Collins got into a physical confrontation with Dave Bullard ("Bullard"), a white driver from Dick Lavy Trucking. *See id.* ¶ 15. Collins

maintains that Bullard became irate after Collins attempted to assist him with Ardent Mills' protocol for entering and exiting the Saginaw facility. *See id.* Bullard purportedly screamed racial slurs and attempted to spit on Collins. *See id.* Collins admits to striking Bullard in response. *See id.*

Collins emailed Peter Elsham ("Elsham") about the incident later that day. *See* Doc. No. 53-1 at 229. Elsham worked as a grain merchandiser for Ardent Mill before his retirement in 2020. *See* Doc. No. 57 at 9. His responsibilities included arranging crosstown deliveries of wheat from various suppliers to Ardent Mills' Saginaw plant. *See id.* Elsham forwarded Collins' email to a number of Ardent Mills employees, including Jon Cozad ("Cozad")—the regional plant manager for a number of Ardent Mills' facilities, including Saginaw and Sherman. Ultimately, Cozad ordered both Collins and Bullard personally banned from all Ardent Mills facilities. *See* Doc. No. 53-1 at 228. CKT, however, was still permitted to perform deliveries for the Saginaw plant. *Id.* Cozad formally notified Collins and Bullard of their indefinite premises bans in letters dated December 10, 2016. *Id.* at 190-91. CKT did continue to haul for the Saginaw plant, and even eventually began hauling for Ardent Mill's Sherman facility. *See* Doc. No. 31 ¶ 18.

### E.  Collins' Return to the Saginaw Facility

On or about August 10, 2018, Collins was contacted by Kaitlin Larson ("Larson")—a logistics coordinator for Ardent Mills. *See* Doc. No. 53-1 at 301; Doc. No. 57 at 10. According to CKT, Larson "begged *C & K Trucking* to pick up an

emergency load at Ardent Mill's Saginaw plant." Doc. No. 31 at 20 (emphasis added).

Parties dispute whether Larson asked Collins to personally pick up the load, or whether

she asked him to send one of CKT's drivers to pick it up. *See* Doc. No. 58-3 at 27-29;

Doc. No. 62 at 13. Regardless, Collins admits to entering the Saginaw premises to pick

up the load, "knowing that he was still technically not allowed on site[.]" Doc. No. 31

¶ 20.

At some point later that day, Theresa Knestrick ("Knestrick")—a lead grain

elevator operator at Ardent Mills' Saginaw plant—observed Collins picking up the load

at the Saginaw facility. *See* Doc. No. 58-2 at 5, 14. She reported Collins to Cozad. *See*

*id.* In response, Cozad sent an email to a number of Ardent Mills employees informing

them that Collins "most likely" violated Ardent Mills' ban. *See id.* at 29. Minutes later,

Cozad sent another email on the same chain: "I just received confirmation that it was

Kenyon and we have video and pictures. My opinion is that C and K should not haul

in and out of Saginaw. Again, we would not make an exception with a terminated

employee, so we should not do it for a carrier or contractor. Please advise[.]" *Id.* Eric

Miller ("Miller")—an Ardent Mills feed merchant (*See* Doc. No. 53 ¶ 77)—replied,

"This is extremely concerning. Would you mind sending me the video and pictures so

I have all of the evidence available before I have the conversation with Kenyon? . . .

We need to get to the bottom of this and make a group based decision as to what is

best for the company. We're currently working on adding more carriers to our Saginaw

base so Kenyon's company won't need to haul there. Trucks are extremely tight as you

know so it has been difficult." Doc. No. 58-2 at 29. Cozad then responded, "We need to hold our safety value above our business priorities and not contract C and K to haul products in or out of our facility or any other Ardent Mills facility. We are pretty sure this is not the first time Kenyon has hauled out of the location, just the first time we have it confirmed." *Id.* at 28. Travis Kapusta ("Kapusta")—an Ardent Mills employee included on the email chain—replied to Cozad, "I agree and we need to support Sag in their request. They no longer haul for Ardent Mills[.]" *Id.*

Notwithstanding Cozad's email—and apparently realizing the extent of the carrier shortages—Miller emailed Kapusta later that day: "Banning Kenyon in Sherman right now maybe problematic because we don't have a viable replacement this very second. We can certainly work towards a replacement, but cutting him off cold turkey in sherman would be tough." *Id.* at 31. Copying Cozad and Patrick Smith ("Smith")—Ardent Mills' Sherman plant manager (*see* Doc. No. 57 at 10)—Kapusta responded, "Well I started some crap on this. We will ban them out of Sag right away and we will phase out in sherman over time if possible." Doc. No. 58-2 at 32. Collins was never informed of the "phase out" plan, though Larson was. *See* Doc. No. 57 at 15-16; Doc. No. 58-3 at 60. It is not immediately apparent to the Court how or when CKT was notified of its ban at Ardent Mills' Saginaw facility. *Compare* Doc. No. 31 ¶ 20, *with* Doc. No. 53-1 at 129, 140, 146-47, *and* Doc. No. 58-2 at 18.

### F.  CKT Replaces RJ Trucking in Sherman

As mentioned above, CKT continued to haul for Ardent Mills' Sherman facility after its ban at the Saginaw facility. *See* Doc. No. 31 at 20. Over time, CKT began delivering wheat middlings from the Sherman facility to Ardent Mills' customers in addition to its regular wheat deliveries to the facility. *See* Doc. No. 53 at 17. Wheat middlings ("midds" for short) are byproducts of the wheat milling process used for animal feed. *See id.* Things were seemingly going well.

In or around April 2019, Larson received word that the owner of RJ Trucking—Ardent Mills' "primary hauler" of midds out of the Sherman facility—was retiring. *See* Doc. No. 31 ¶ 22; Doc. No. 53 at 17-18. It is unclear what happened to Ardent Mills' plan to "phase out" CKT in Sherman; Ardent Mills argues Larson simply gave up on finding a replacement. *See* Doc. No. 62 at 20. On April 12, 2019, Larson emailed Collins to inquire about CKT's interest in taking over for RJ Trucking: "We got some bad news this week about RJ Trucking, you might have already heard but sounds like he is shutting down his business for good by the end of the month. . . . That being said will you be able to cover the loads RJ was doing every week in addition to your own? It would be about 30 loads per week, give or take a few, probably starting the week of 4/22." Doc. No. 58-3 at 66. Collins responded, "Yes we heard about RJ and we're sad to hear that as well. I can attest how hard it is to keep and find good drivers. I can cover the loads RJ was doing in addition to mine, but will definitely need to get some things in place. Do you foresee this arrangement being long-term or just temporary until you

find another company to backfill RJ?" *Id.* Larson replied, "Is 10 days enough time? I can plan on bringing in outside trucks for week of 4/22 if that is too soon to take over. Yes I see this being long term, we don't have any plans to find a carrier to take RJ's spot. I do see us having outside trucks coming in from time to time though. . . . I would say you can plan on doing 90% of the loads, if not more, every week though." *Id.* CKT ultimately replaced RJ Trucking as the primary hauler of midds out of the Sherman facility. *See* Doc. No. 31 ¶¶ 24, 26; Doc. No. 53 at 18; Doc. No. 58-3 at 68.

CKT maintains that it made additional infrastructure and staffing investments based on Larson's emails and its new role at the Sherman plant, including the purchase of a commercial property adjacent to the plant. Doc. No. 31 ¶ 25. CKT alleges that this was part of Ardent Mills' plan to "lead [it] on" and then terminate the relationship at the first available opportunity. *Id.* ¶¶ 26-27.

From April 2019 through December 2019, CKT reliably hauled for the Sherman facility, seemingly without incident. *See* Doc. No. 31 at 7. The record suggests that Collins, Larson, and Melissa Calfy ("Calfy")—a grain handler at Ardent Mills' Sherman plant—enjoyed a good working relationship. *See* Doc. No. 58-3 at 35-36, 69, 87-88, 107.

### G. Incident with Attebury Grain

Attebury Grain is one of two primary suppliers of wheat for Ardent Mills' Texas facilities. *See* Doc. No. 53 at 18. In or around January 2020, Collins asked Calfy to reach out to Stephanie Davis ("Davis")—an employee at Attebury Grain—about

rethinking her decision to discontinue the use of CKT's services at Attebury Grain. *See id.* at 23-24; Doc. No. 57 at 18. When Calfy contacted Davis about the matter, Davis explained that she would not use CKT because Collins and CKT's drivers had been disrespectful to her, and because Collins had cursed at her. *See* Doc. No. 53 at 28. Calfy reported this back to Collins. *See id.*

Copying Calfy and Elsham, Collins sent an email to Davis regarding her allegations on January 14, 2020. *See* Doc. No. 53-1 at 291. Collins stated, "I asked Melissa at Ardent Mills to reach out to you about us resuming hauls for Attebury. She informed me that you told her C&K will never haul for Attebury again because I cursed at you. Stephanie - I nor any of my drivers have ever cursed or been disrespectful to you. . . . I am at a loss as to why you would say that about me and defame my character. I enjoyed working with you all and hope to resume hauling for Attebury again one day. But I want to make sure this issue is addressed directly. That is not who I am and not what my company represents." *Id.* Copying Calfy and Elsham, Davis responded, "Kenyon, you know why you no longer haul for Attebury. Melissa did reach out to me and I told her that you had been ugly to me and lost your temper and cursed at me which is the truth. This is the end of the matter as far as I'm concerned. I hire my own drivers and I do not wish to utilize your services." *Id.* at 290.

Elsham reached out to Calfy, Cozad, and Smith about the exchange. *See* Doc. No. 58-3 at 110. Cozad responded, "Just to remind everyone. We had multiple issues with Kenyon in the past in Saginaw and he nor C and K are to haul inbound or

outbound with regards to our plant here in Saginaw[.]" *Id.* Smith replied, "Think I need to understand the email chain better. I will talk to Mellisa [sic] tomorrow. Sounds like there is some misunderstanding. I understand issues in Saginaw. C&k have been okay in Sherman for feed transportation only. I will investigate and trust that they are on a thin line for work in Sherman. This is highly disappointing[.]" *Id.* Smith also responded to Elsham in a separate email chain early the next morning: "Thanks Pete, because of issues he had in Saginaw he was on probation here. I reluctantly allowed him to haul feed out of Sherman because of the feed merchants wishes. That will no longer be the case. It also appears that he has used Mellisa [sic] so I will spend some time coaching her on this situation[.]" Doc. No. 53-1 at 290. About two hours later, Smith emailed Miller and Larson: "We have had another issue with C&K trucking. My initial reaction is to kick the [sic] off the property but I will be respective of this group's challenges. Please have them replaced by the end of the month." *Id.* at 292. Minutes later, Smith emailed Cozad and Elsham: "I have reached out to the Feed Group and explained that I want C&K out of here by the end of the month[.]" *Id.* at 17.

Larson began searching for CKT's replacement that same morning. *See id.* at 72-73. The search did not take long; Nick Vincent Trucking was interviewed, selected, and onboarded before the end of the next business day. *See id.* at 72. CKT alleges that Nick Vincent Trucking is a non-minority owned business. Doc. No. 31 ¶ 30.

Miller and Larsen called Collins on January 23, 2020 to inform him of Ardent Mills' decision. Miller then emailed Cozad, Smith, and Elsham about the call: "Just a

heads up, but about 10 minutes ago I informed C & K Trucking that as of Feb 1st he will no longer be allowed to haul into or out of Ardent Mills Sherman. Mr. Smith is going to keep up in the loop as to how Kenyon responds in the meantime, but the current plan is to allow CK Trucking to haul for us up until Feb. 1." Doc. No. 53-1 at 208. Larson also offered her thoughts about the call in a separate email to Calfy and Miller: "Just notified Kenyon that we will no longer be utilizing his services and there's a hard end date of Feb. 1. We didn't name anyone or go into specifics, seemed to be a quick convo.. he was obviously upset but didn't get hostile or anything, he mostly seemed confused about it." Doc. No. 58-3 at 75.

Some point not long after speaking with Miller, Collins met with Smith at the Sherman facility. *See* Doc. No. 53-1 at 140, 334. Apparently, this was the first time the two had met. *See id.* at 334. Smith claims that he told Collins the reason behind his decision to stop tendering loads to CKT was that he considered it unprofessional for Collins to ask Calfy to handle his dispute with Attebury Grain. *See id.* at 347. Smith also mentioned to Collins that he would consider allowing CKT to haul out of the Sherman plant again in about a year. *See id.* at 140, 348.

Ardent Mills' Sherman facility stopped tendering loads to CKT on or shortly before February 1, 2020. *See* Doc. No. 53 at 22; Doc. No. 57 at 18.

### H. This Lawsuit

CKT filed this lawsuit on May 5, 2020. Doc. No. 1. CKT was granted leave of court to amend its complaint after portions of Ardent Mills' Motion to Dismiss

Plaintiffs' Original Complaint (Doc. No. 10) were granted. Doc. No. 30. On January 14, 2021, the parties filed a stipulated dismissal of Plaintiffs' defamation claim. Doc. No. 29. Plaintiff's First Amended Complaint was filed on February 1, 2021. Doc. No. 31. Ultimately, the Court granted Defendant Ardent Mills, LLC's Motion to Dismiss Promissory Estoppel Claim in Plaintiff's First Amended Complaint (Doc. No. 32). Doc. No. 48.

CKT alleges Ardent Mills violated 42 U.S.C. § 1981 "by, among other things, paying C & K Trucking less than non-minority trucking companies and terminating C & K Trucking's services in favor of a non-minority trucking company[.]" Doc. No. 31 ¶ 37. Next, CKT alleges Ardent Mills breached the MTA when it "terminate[d] its relationship with [CKT] entirely" without giving the requisite sixty days' notice. *Id.* at ¶¶ 29, 40; *see* Doc. No. 57 at 30. Finally, CKT claims Ardent Mills tortiously interfered with its existing contracts with Cargill, Gavilon Grain, and Nathan Segal & Co. Doc. No. 31 ¶¶ 48-51.

In its counterclaim, Ardent Mills alleges CKT breached the MTA when Collins impermissibly brokered freight in violation of the MTA's terms. Doc. No. 44 at 13-16.

## II.   Legal Standards

### A. Summary Judgment

Summary judgment is appropriate when the pleadings, affidavits, and other summary-judgment evidence show that no genuine issue of material fact exists and the moving-party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A "material fact" is a fact that under the applicable substantive law "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of "a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant, and all disputed facts resolved in favor of the nonmovant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).

The moving party bears the burden of identifying those portions of the record it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322-25. Once a movant makes a properly supported motion, the burden shifts to the nonmovant to show the existence of a genuine fact issue for trial; however, the nonmovant may not rest upon allegations in the pleadings to make such a showing. *Anderson*, 477 U.S. at 256-57. Conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence cannot defeat a motion for summary judgment. *See id.* at 249-52; *Boudreaux*, 402 F.3d at 540. "Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 199 (5th Cir. 1999). If the nonmovant fails to make a sufficient showing to prove the existence of an essential element to the case and on which the nonmovant will bear the burden of

13

proving at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322. The nonmovant must cite specific facts in the record to survive a motion for summary judgment, as "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)); *see* Fed. R. Civ. P. 56(c)(3).

### B. 42 U.S.C. § 1981

42 U.S.C. § 1981 does not provide "a general cause of action for race discrimination." *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358 (5th Cir. 2003). Instead, § 1981 prohibits discrimination in contracting by guaranteeing all persons within the jurisdiction of the United States the "same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." *See* 42 U.S.C. § 1981(a). The phrase "make and enforce contracts" is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). "Any claim brought under § 1981 . . . must initially identify an impaired contractual relationship under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

"To prevail under section 1981, the plaintiff must prove a *prima facie* case of intentional discrimination." *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997). A *prima facie* case of discrimination requires a plaintiff to establish "(1) they are

14

members of a racial minority; (2) Defendants intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute." *Id.* (citing *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017)). "The plaintiff may establish a *prima facie* case by direct evidence or, more commonly, by circumstantial evidence of discriminatory motive." *Id.* Plaintiff must make its *prima facie* case by a preponderance of the evidence. *Powell v. Zurich Am. Ins. Co.*, 653 F. App'x 292, 297 (5th Cir. 2016).

Where Plaintiff offers sufficient evidence to establish its *prima facie* case, a presumption of discrimination arises as courts apply the *McDonnell Douglas* burden shifting framework. *Thomas v. Johnson*, 788 F.3d 177, 179 (5th Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). The burden then shifts to defendant to rebut the presumption of discrimination by producing evidence "that its actions were justified by a legitimate, nondiscriminatory reason." *Id.* "The burden then shifts back to the plaintiff, who must show the articulated reason is pretextual." *Id.*; *see Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). "[A] plaintiff can establish pretext either through evidence of disparate treatment or by showing that the defendant's proffered explanation is false or unworthy of credence." *Powell*, 653 F. App'x at 298 (internal citation omitted). Under the *McDonnell Douglas* framework (and for all § 1981 claims), plaintiff must be able to "ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, —U.S.—, 140 S. Ct. 1009, 1019, 206 L. Ed. 2d 356 (2020).

### C. Breach of Contract

The MTA test is governed by the laws of the State of Minnesota. *See* Doc. No. 53-1 at 201 ("The terms of this Agreement shall be governed by the laws of the State of Minnesota, without regard to its conflicts of law rules."). It does not appear to the Court that the parties dispute this. A breach of contract claim in Minnesota requires proof of three elements: "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011) (citing *Briggs Transp. Co. v. Ranzenberger*, 299 Minn. 127, 129, 217 N.W.2d 198, 200 (1974)).

### D. Tortious Interference with Existing Business Relations

Under Texas law, a party claiming tortious interference with existing business relations must show: "(1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss." *Unicorn Glob., Inc. v. GoLabs, Inc.*, 447 F. Supp. 3d 535, 547 (N.D. Tex. 2020) (Godbey, J.) (citing *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000)).

### III.   Analysis

Because a § 1981 claim fails as a matter of law if plaintiff lacks "rights under the existing (or proposed) contract that he wishes 'to make and enforce[,]'" the Court will

first analyze Plaintiff's breach of contact claims. *Domino's Pizza, Inc.*, 546 U.S. at 479-80 (quoting 42 U.S.C. § 1981).

### A. Contract Claims

#### 1. *Breach of the Sixty Days' Notice Clause*

In its Term and Termination section, the MTA states that it "shall continue until a party terminates this Agreement upon sixty (60) days prior written notice to the other party or is otherwise terminated [upon the occurrence of a specified event]." Doc. No. 58-1 at 55. CKT argues that Ardent Mills breached the MTA when it prematurely "terminate[d] its relationship with [CKT] entirely on February 1, 2020, despite the fact that the Agreement expressly required Ardent Mills to give [CKT] 60 days' prior written notice to terminate it." Doc. No. 31 ¶ 29.

Ardent Mills reasons that it did not breach the Sixty Days' Notice Clause because it merely "suspended"—not terminated—the MTA. *See* Doc. No. 53 at 50. In support of this reasoning, Ardent Mills notes that the MTA is non-exclusive and does not require Ardent Mills to tender any freight to CKT. *See id.* Further, Ardent Mills notes that CKT has been unable to identify any communication from Ardent Mills explicitly stating the MTA was terminated. *See id.* Ardent Mills argues Smith's statement to Collins that he would consider allowing CKT to haul out of the Sherman plant again in about a year is more consistent with a suspension than a termination. *See id.* Finally, Ardent Mills argues that even if it breached the Sixty Days' Notice

Clause, CKT is unable to prove damages because the MTA does not obligate Ardent Mills to tender loads to CKT. *Id.*

The Court finds CKT has sufficiently established, for purposes of summary judgment, that there are genuine disputes of material facts as to whether Ardent Mills prematurely terminated the MTA, or merely suspended its use of CKT's services. Considering the lack of any explicit language of termination and Collins' meeting with Smith, a reasonable jury could conclude that Ardent Mills merely suspended CKT and therefore did not violate the Sixty Days' Notice Clause. Also, although Ardent Mills states that it has "facilities in the United States, Canada, and Puerto Rico" (Doc. No. 53 at 6), it is unclear whether the MTA would cover all jobs CKT could theoretically perform for Ardent Mills' other facilities. On the other hand, a reasonable jury could conclude from, *inter alia*, Smith's emails and other communications with Collins, that Ardent Mills improperly terminated the MTA in violation of the Sixty Days' Notice Clause.

Damages are a separate question. The Court has already stated that Texas courts recognize nominal damages and "must . . . attempt to give effect to all contract provisions so that none will be rendered meaningless." *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998); Doc. No. 30 at 8-9. Minnesota courts do the same. *See Youngers v. Schafer*, 264 N.W. 794, 796 (1936) ("When reasonably possible a contract should be so construed as to give it effect rather than to nullify it."); *Park Nicollet Clinic*, 808 N.W.2d at 833 n.5 ("We have recognized that the plaintiff

may not have to allege that the breach caused damages in order to state a claim for breach of contract.").

Here, CKT argues in its Response that the "whole purpose for [the Sixty Days' Notice Clause] is that Ardent Mills be required to continue doing business with C & K Trucking during that 60-day period . . . [t]hus, at the very least, C&K Trucking is entitled to damages relating to the loads it would have received during the last 60 days of the Agreement had Ardent Mills provided notice." The Court disagrees. It is entirely possible under the terms of the MTA that Ardent Mills could—in the same way as could CKT—elect to terminate the MTA upon sixty days' prior written notice, tender no loads to any party during that time, and remain in compliance with the terms of the MTA. CKT fails to point the Court to any provision in the MTA that obligates Ardent Mills to tender freight to CKT for any period of time. Thus, even if Ardent Mills is found to have prematurely terminated the MTA by violating the Sixty Days' Notice Clause, CKT has failed to establish it is entitled to any damages from such a breach.

For these reasons, Plaintiff has demonstrated the parties genuinely dispute material facts related to whether Ardent Mills prematurely terminated the MTA or merely suspended its use of CKT's services. Thus, Ardent Mills' Motion is **DENIED** as to its liability for breaching the MTA but **GRANTED** as to this damages theory.

### 2. *Contract Modification*

In its Response, CKT maintains that it previously pled that Larson's emails with Collins modified the MTA, which Ardent Mills later breached when it stopped

tendering loads to CKT. Doc. No. 57 at 28-30. However, CKT fails to cite to where it previously advanced this argument, and the Court cannot locate it. Ardent Mills makes a similar point in its Reply. Doc. No. 62 at 20 ("Only now has CKT averred that Larson's email supports a contract claim."). CKT did not motion this Court to amend its Complaint after Ardent Mills made this argument, nor did it move to file a surreply.

"A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. Of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)). Because CKT's contract modification claim was raised for the first time in its Response, it is not properly before the Court, and the Court will not consider it.

### 3.   *Disparate Pay Breach*

In its Response, CKT argues that Ardent Mills breached the MTA by paying CKT less than it paid others for the same work. *Compare* Doc. No. 57 at 32, *with* Doc. No. 31 at 9. However, it does not appear to the Court that CKT previously pled this separate breach of contract claim, and instead pled only a disparate pay / treatment allegation under § 1981. *See* Doc. No. 31 ¶¶ 34-40. A claim that Ardent Mills breached the MTA by paying CKT less than it paid others for the same work is not necessarily the same as a claim that Ardent Mills ran afoul of § 1981 by engaging in contractual discrimination by paying CKT less for contracts than other non-minority owned trucking companies on the basis of race. CKT fails to articulate any rights under the

20

MTA that would obligate Ardent Mills to pay it the same as other trucking companies. Thus, it appears that this claim is also not properly before the court. *See Cutrera*, 429 F.3d at 113.

Regardless, the substance of CKT's disparate pay allegation is discussed in Section III(B)(2) below. Even if the Court were to construe the Complaint to allege CKT's breach of contract claim as it describes it in its Response (*see* Doc. No. 57 at 32-36), it would not survive summary judgment because CKT fails to establish that Ardent Mills breached the MTA by paying it less than it paid others for the same work. Thus, the Court **GRANTS** Ardent Mill's Motion on CKT's claim that Ardent Mills breached the MTA by paying it less than it paid others for the same work.

### B. *Section 1981 Claim*

CKT alleges Ardent Mills violated § 1981 by engaging in contractual discrimination by paying CKT less on its contracts than other non-minority owned trucking companies and by terminating the MTA without due notice in favor of a non-minority owned trucking company, both on the basis of race. *See* Doc. No. 31 ¶ 37. Ardent Mills moves for summary judgment on CKT's § 1981 claim, arguing that: (1) CKT cannot establish *prima facie* § 1981 claim; (2) that it had legitimate, nondiscriminatory reasons for the actions CKT perceives as discriminatory treatment; and (3) CKT cannot show that such reasons were mere pretext. The Court agrees with Ardent Mills for the reasons stated below and **GRANTS** Ardent Mills' Motion on CKT's § 1981 claim.

1.   *Termination of the MTA Allegation*

CKT claims that Ardent Mills improperly terminated the MTA in favor of a non-minority owned trucking company on the basis of race. Although the Court has denied summary judgment on the question of whether Ardent Mills terminated the MTA at all (and thus it has not determined whether Ardent Mills breached the Sixty Days' Notice Clause), it is possible that if Ardent Mills so breached, it could have been for nondiscriminatory reasons. Accordingly, the Court examines this claim separately.

As noted above, the MTA was allegedly terminated when Smith—the employee with the authority behind the alleged decision to terminate—decided to stop tendering loads to CKT out of the Sherman facility. However, even if the jury were to find that Smith terminated the MTA, CKT has offered no evidence that Smith's decision was made with discriminatory intent.

CKT alleges that Ardent Mills encouraged CKT to make significant additional investments on the belief that it would be Ardent Mills' long-term partner in Sherman, all the while plotting to drop CTK at the first available opportunity. *See* Doc. No. 31 ¶¶ 23-27. CKT apparently alleges that this plan was made on the basis of race. *See id.* ¶ 37. The evidence tells a different story. Despite CKT's allegations of a malicious conspiracy, the record generally reveals a positive relationship between CKT and Ardent Mills' Sherman plant employees up until the incident with Davis at Attebury Grain. Only after Davis' email did Smith ask Miller and Larson to begin searching for CKT's replacement. This email was sent before Larson or Calfy made any indication to

22

Smith that Collins made them uncomfortable. *See* Doc. No. 57 at 22. And the record reveals that Larson only contacted Nick Vincent Trucking after Smith's directive. *See id.* at 20. No evidence has been introduced to rebut Larson's claim that in 2018 she simply gave up on finding a replacement for CKT in Sherman after the incident at the Saginaw plant.

CKT does allege that "higher-up Ardent Mills employees made crude and racially insensitive comments about Collins amongst themselves behind [Collins'] back." Doc. No. 31 ¶ 19. But CKT cites only one example of this, and it does not involve Smith. On August 27, 2015, Collins wrote an email to Elsham concerning future workloads. *See* Doc. No. 57 at 7. In the email, Collins addresses Elsham as "Mr. Pete." *See id.* Elsham forwarded the email to a number of coworkers, writing: "Nice overture from CK. He has dedicated 1 trk sometimes 2. Need your feedback[.]". *See id.* Mike Dean— Elsham's boss—responded, "Mr Pete!" *See id.* Elsham replied, "That's what they says in the south[.]" *See id.*

Ardent Mills argues that "Elsham was not referring to African-Americans when he wrote '[t]hat's what they says in the south[.]'" Doc. No. 62 at 15. Notwithstanding the dubious veracity of this defense, the fact remains that CKT fails to connect this instance to Smith's alleged decision to terminate the MTA. Smith was not even included on the email chain, and the emails were sent years before the MTA was allegedly terminated.

To the extent that CKT attempts to use the instances cited in Section III(B)(3) below as additional evidence of Ardent Mills' alleged termination of the MTA based on race, the claim still fails to survive summary judgment as CKT establishes neither that Ardent Mills had the intent to discriminate on the basis of race nor that Ardent Mills' nondiscriminatory explanations are pretextual.

### 2. *Treatment and Pay Discrepancy Allegations*

CKT alleges that Ardent Mills afforded a non-minority owned trucking company preferential treatment and that Ardent Mills paid it less than a non-minority owned trucking company, both on the basis of race. *See* Doc. No. 31 ¶ 37. For the former allegation, CKT argues "C & K Trucking provided superior service to RJ Trucking, but RJ Trucking still received priority on routes until its owner retired." Doc. No. 57 at 29. CKT attempts to buttress this claim with citations that indicate CKT's reliability and work ethic. *See* Doc. No. 58-3 at 54-60. Ardent Mills rebuts this claim by arguing that any preferential treatment RJ Trucking received was due to its long-term relationship with Ardent Mills and because it was the "primary hauler" of midds at the Sherman facility. Doc. No. 62 at 13-14. "Plaintiffs' personal, subjective views of their own performance are not probative evidence of falsity or pretext." *Coleman v. Exxon Chem. Corp.*, 162 F. Supp. 2d 593, 615 (S.D. Tex. 2001). And CKT eventually did replace RJ Trucking as the "primary hauler" for midds out of the Sherman plant. CKT fails to establish that any preferential treatment for RJ Trucking was on the basis of race.

24

That leads to CKT's latter claim that Ardent Mills paid it less than a non-minority owned trucking company on the basis of race. *See* Doc. No. 31 ¶ 37; Doc. No. 57 at 16-17, 29-30. Here, CKT alleges that it was sometimes paid less than RJ Trucking for similar routes, apparently both before and after it became the primary hauler for midds out of the Sherman facility. *See* Doc. No. 57 at 30. CKT makes a similar claim about Nick Vincent Trucking. *See id.* However, CKT admits that it was sometimes paid more than RJ Trucking and Nick Vincent Trucking for the same routes. *Id.* CKT fails to offer evidence that race played any part for the instances in which it was paid less.

### 3. *Other Allegations*

In its Response, CKT also alleges that it has "demonstrated a prima facie case regarding Ardent Mills' intent to discriminate against C & K Trucking on the basis of race in the making, performance, modification and/or termination of a contract" in that (1) its drivers were required to unload trucks in the back of Ardent Mills' Saginaw facility while drivers of non-minority owned trucking companies were permitted to unload in the front (*see* Doc. No. 57 at 10, 25; Doc. No. 58-1 at 12-17, 67-68, 80); (2) its drivers were made to wait longer to make deliveries at the Saginaw plant than other trucking companies' white drivers (*see* Doc. No. 57 at 11, 26; Doc. No. 58-1 at 67-68, 75-76); (3) a specific employee at Ardent Mills' Saginaw plant spoke to CKT's minority drivers harshly and disrespectfully but did not speak the same way to the drivers of a different, non-minority owned trucking company (*see* Doc. No. 57 at 11, 26; Doc. No. 58-1 at 16-18, 22, 77-78); and (4) CKT was cited for certain violations of Ardent Mills'

policies while other non-minority owned trucking company violators were not (*see* Doc. No. 57 at 11, 26; Doc. No. 58-1 at 18-22, 70-71).

Here, CKT merely cites certain language from the statute; it is not clear to the Court how CKT connects these specific allegations to a § 1981 claim. In other words, CKT has failed to establish prong three of making its *prima facie* case—how these allegations concerned one or more of the activities enumerated in the statute. And even if CKT had established the third prong of its *prima facie* case, it nevertheless fails to establish by a preponderance of the evidence that Ardent Mills had the intent to discriminate on the basis of race in any of these four instances. Nor does it establish by a preponderance of the evidence that Ardent Mills' nondiscriminatory explanations are pretextual.

### C. Tortious Interference with Existing Business Relations Claim

CKT alleges that Ardent Mills tortiously interfered with its existing contractual relationships with Cargill, Attebury Grain, Gavilon Grain, and Nathan Segal & Co. *See* Doc. No. 31 ¶ 48-51; Doc. No. 57 at 36-39. However, CKT admits that it never had a contract with Nathan Segal & Co. Doc. No. 58-1 at 34. And CKT seemingly abandons its claim as to the Cargill contract as it only specifically addresses its contracts with Attebury Grain and Gavilon Grain in its Response. Doc. No. 57 at 37.

CKT admits that its contract with Gavilon Grain was never terminated (*see* Doc. No. 58-1 at 33), and instead argues that it need only show some interference from Ardent Mills that made performance on the contract more burdensome or of less value

26

to maintain a tortious interference with existing business relations claim. Doc. No. 57 at 37 (citing *Khan v. GBAK Properties, Inc.*, 371 S.W.3d 347, 359-60 (Tex. App.— Houston [1st Dist.] 2012, no pet.)). CKT argues Ardent Mills made such an interference when it contacted "Gavilon Grain to inform [it] of C & K Trucking's ban from Ardent Mills properties." *Id.* at 35. However, Collins describes his contract with Gavilon Grain as a "regular carrier agreement." Doc. No. 58-1 at 33. CKT has not produced for the Court this carrier agreement, nor does it point to any rights under the agreement that Ardent Mills interfered with.

Regarding CKT's contract with Attebury Grain, Davis' email explained that Attebury Grain stopped tendering loads to CKT after Collins behaved disrespectfully to her, not because Ardent Mills informed Attebury Grain of CKT's Saginaw ban. *See* Doc. No. 53-1 at 290. Thus, CKT has failed to establish that Ardent Mills proximately caused any actual damages or loss related to the contract with Attebury Grain.

For these reasons, the Court **GRANTS** Ardent Mills' Motion on CKT's tortious interference with existing business relations claim.

### D. Ardent Mill's Breach of Contract Counterclaim

Moving for summary judgment on its breach of contract counterclaim, Ardent Mills alleges CKT breached the MTA by brokering loads tendered to CKT to other carriers without notice to Ardent Mills. *See* Doc. No. 53 at 53. Ardent Mills points to the second paragraph of the MTA which states "Carrier is not authorized to broker fright under this contract[.]" *See* Doc. No. 58-1 at 51. Collins admits to using

27

contractors to help deliver loads for Ardent Mills. *See* Doc. No. 55-1 at 10-13. CKT argues that Ardent Mills' breach of contract counterclaim nevertheless fails because it cannot establish damages. *See* Doc. No. 61 at 2. However, Ardent Mills only seeks partial summary judgment on this counterclaim for liability and does not contend that the amount of damages may be determined by summary judgment. *See* Doc. No. 53 at 54. Because CKT admits to violating the terms of the MTA by brokering freight, the Court **GRANTS** Ardent Mills' Motion as to CKT's liability for breaching the MTA, but not as to damages.

## IV.    Conclusion

For the reasons cited above, Court **GRANTS in part** and **DENIES in part** Defendant's Motion and **DENIES** Plaintiff's Motion. CKT has one contract claim remaining for nominal damages; damages on Defendant's counterclaim also remain to be adjudicated.

**SO ORDERED.**

Signed February 19th, 2022

_____
ED KINKEADE
UNITED STATES DISTRICT JUDGE

28